**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JOSHUA FERDMAN,

     Defendant - Appellant.

No. 13-2196

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:12-CR-411-JB-1)**

Laura Fashing, Assistant United States Attorney (Damon P. Martinez, Acting United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

John V. Butcher, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

Before **LUCERO**, **BALDOCK**, and **HOLMES**, Circuit Judges.

**BALDOCK**, Circuit Judge.

     Defendant Joshua Ferdman and three co-conspirators concocted a scheme to fraudulently obtain cellular phones from Sprint stores in Arizona, California, and New Mexico, and resell them. To make a long story short, Defendant illicitly

obtained the account information of numerous Sprint corporate customers. With this information in tow, Defendant went to various Sprint stores and purchased phones by impersonating the corporate account representatives. Defendant charged the price of the phones to the corporate accounts, and then sold at least some of the phones to one of his co-conspirators for online resale.

In one particular instance, on May 25, 2011, Defendant entered a Sprint store in Albuquerque, New Mexico, and held himself out as an authorized representative of Double Vision Glass and Mirror. Defendant charged thirteen smartphones to Double Vision's corporate account and left the store with the phones. Shortly thereafter, Defendant phoned the same Sprint store and ordered seven additional phones, once again charging them to Double Vision's account. A suspicious Sprint employee contacted Double Vision to confirm the order. After learning Defendant was an imposter, the employee lured him back to the store by sending him a text message advising him that his phones were ready for pickup. Albuquerque police officers arrested Defendant when he returned to the store.

Defendant subsequently pled guilty to a two-count indictment. The first count charged Defendant and his three co-conspirators with (a) conspiracy to transport in interstate commerce fraudulently obtained goods valued at $5,000 or more, and (b) conspiracy to use unauthorized access devices to obtain goods valued at $1,000 or more, both in violation of 18 U.S.C. § 371. The second count charged the four with the substantive crime of using unauthorized access devices to obtain goods

2

valued at $1,000 or more, in violation of 18 U.S.C. § 1029(a)(2). The district court

sentenced Defendant to fifteen months in prison.

As part of his sentence, the court ordered Defendant to pay Sprint $48,715.59

in restitution pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C.

§ 3663A. The court calculated this amount based on what Sprint referred to as the

"retail unsubsidized price" of 86 cell phones Defendant fraudulently procured

between May 15 and May 25, 2011, plus Sprint's shipping and investigative costs.

Defendant now appeals the district court's restitution order, arguing the

Government's proof of loss was insufficient to support the award.

Our jurisdiction arises under 18 U.S.C. § 3742(a). We review the district

court's application of the MVRA de novo and its factual findings for clear error,

while ultimately assessing the amount of the restitution award under an abuse of

discretion standard. United States v. Shengyang Zhou, 717 F.3d 1139, 1152 (10th

Cir. 2013). Applying the appropriate standards, we vacate the order of restitution

for lack of an adequate evidentiary basis, and remand.

I.

To better understand the particulars of this case, let us first consider the

law generally applicable to the district court's order of restitution. A district court

may order criminal restitution only as authorized by federal statute. Id. at 1154. As

relevant here, the MVRA "shall apply in all sentencing proceedings" following

a conviction for "any offense committed by fraud or deceit." 18 U.S.C.

3

§ 3663A(c)(1)(A)(ii).  Just last term in Paroline v. United States, 134 S. Ct. 1710, 1726 (2014), the Supreme Court explained that while criminal restitution "serves punitive purposes" by implicating the Government's prosecutorial powers, its "primary goal" is "remedial or compensatory."[1]  Thus, the principal aim of such restitution is to ensure that crime victims, to the extent possible, are made whole for their losses.  United States v. James, 564 F.3d 1237, 1246 (10th Cir. 2009).  This means restoring victims to the position they occupied before the crime.  See Hughey v. United States, 495 U.S. 411, 416 (1990).  Restitution must not unjustly enrich crime victims or provide them a windfall.  James, 564 F.3d at 1246.  To these ends, an order of restitution imposed pursuant to the MVRA must be based on "the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A).  "We have held a district court may not order restitution in an amount that exceeds the actual loss caused by the defendant's conduct, which would amount to an illegal sentence constituting plain error."  James, 564 F.3d at 1243; see also United States v. Serawop, 505 F.3d 1112, 1124 (10th Cir. 2007).

---

[1]  Prior to Paroline, the Tenth Circuit had "consistently held . . . 'that the MVRA does not inflict criminal punishment, and thus is *not* punitive.'"  United States v. Speakman, 594 F.3d 1165, 1177 (10th Cir. 2010) (quoting United States v. Serawop, 505 F.3d 1112, 1122–23 (10th Cir. 2007) (collecting cases) (emphasis in original)).  Although Paroline addressed restitution under 18 U.S.C. § 2259, a component of the Violence Against Women Act, the Supreme Court's statement regarding the general nature of criminal restitution calls into question our view that the MVRA lacks a penal element.

4

Where return of the stolen property is not feasible, the defendant must pay "the value of the property" to the victim of the offense, plus, in any event, "expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(1), (b)(4). Although the MVRA does not define "value," and does not expressly authorize restitution for lost sales or profits, we have recognized that § 3663A "appears to contemplate the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case." James, 546 F.3d at 1245 (internal quotations omitted). "[T]his approach allows the district court to determine in each circumstance the best measure of value for the purpose of calculating the [victim's] actual loss. . . ." Id. at 1246.

A district court shall issue and enforce an order of restitution under the MVRA in accordance with 18 U.S.C. § 3664. Id. § 3663A(d). "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by a preponderance of the evidence. The burden of demonstrating the amount of loss sustained by the victim as a result of the offense shall be on . . . the Government." Id. § 3664(e). Prior to sentencing, the probation office must "obtain and include in its presentence report . . . information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim . . . ." Id. § 3664(a). The probation office must also provide the victim an opportunity to file "a separate affidavit relating to the amount of the victim's losses subject to restitution." Id. § 3664(d)(2)(A)(vi).

5

Concurrent with the passage of the MVRA in 1996, Congress amended § 3664 to include subsections (d)(4) and (d)(6), which permit the district court to require proof of loss beyond that contained in the presentence report (PSR) and to refer the matter for hearing and proposed resolution. Pub. L. No. 104-132, § 206(a), 110 Stat. 1214, 1233 (1996). After reviewing the PSR and any objections thereto, the district court "may require additional documentation or testimony" before awarding restitution. Id. § 3664(d)(4). For the protection of the victim, "[t]he privacy of any records filed, or testimony heard" pursuant to subsection (d)(4) "shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera." Id. The court also "may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition," subject to de novo review. Id. § 3664(d)(6). Finally, the MVRA provides that a district court may decline to award restitution where "complex issues of fact related to the . . . amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." Id. § 3663(c)(3)(B).

All this is not to say that the restitution phase of criminal sentencings should become a substitute for civil trials. For instance, although the MVRA allows recovery of losses "actually caused by the defendant's offense," it does not allow recovery of consequential or incidental damages. Shengyang Zhou, 717 F.3d at 1154

6

(internal quotations omitted). According to the MVRA's legislative history: "It is the committee's intent that courts order full restitution to all identifiable victims of covered offenses, while guaranteeing that the sentencing phase of criminal trials do not become fora for the determination of facts and issues better suited to civil proceedings." S. Rep. No. 104–179, at 189 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 931.

But this does not mean a district court may dispense with the necessity of proof as mandated by the MVRA and simply "rubber stamp" a victim's claim of loss based upon a measure of value unsupported by the evidence. A district court "may resolve restitution uncertainties with a view towards achieving fairness to the victim so long as it still makes a reasonable determination of appropriate restitution *rooted in a calculation of actual loss*." United States v. Gallant, 537 F.3d 1202, 1252 (10th Cir. 2008) (emphasis added). True, the MVRA does not require a court to calculate a victim's actual loss with "exact" precision. United States v. Parker, 553 F.3d 1309, 1323 (10th Cir. 2009). Considered in its entirety, however, the MVRA undoubtedly "require[s] *some* precision when calculating restitution. Speculation and rough justice are not permitted." United States v. Anderson, 741 F.3d 938, 954 (9th Cir. 2013) (emphasis added). Where a district court concludes the record contains insufficient information to permit a timely calculation of a victim's actual loss, the MVRA provides the court with three non-mutually exclusive options: (1) ask the Government to submit additional evidence, (2) hold an evidentiary hearing, or (3)

7

decline to order restitution. 18 U.S.C. §§ 3663A(c)(3)(B), 3664(d)(4), (d)(6). Issuing an order of restitution unsupported by the evidence is not an option. See United States v. Fair, 699 F.3d 508, 516 (D.C. Cir. 2012).

II.

Mindful of the foregoing, we turn to the particulars of this case. Sprint's regional manager of investigations submitted to the probation office an unverified or unsworn two-page letter purporting to list the amount of the phone losses Sprint sustained from May 8 through May 25, 2011, as a result of Defendant's fraud. Sprint based its claim of loss on the "retail unsubsidized price" of the cell phones. The retail prices listed for those phones, as shown on the sales receipts, were either $549.99 or $449.99. The letter's explanation for Sprint's claim of loss for the phones is rather terse, stating in its entirety: "The phone losses are the retail unsubsidized price of these phones." The letter also set forth *estimates* of expenses Sprint incurred as a result of Defendant's crimes. Sprint did not provide the probation office with an affidavit or any receipts or other documentation to support its claimed expenses. The letter's explanation for those expenses reads:

> The investigative travel costs were estimated costs for travel to [New Mexico] to deal with this issue on a trip. The investigative manhours was my estimated investigative time for conducting Sprint's investigation into this issue. The $65/hr rate is an estimate of costs to Sprint for salary and various overhead costs. The shipping costs were estimated to be able to ship new phones to the stores to replace phones that were lost due to these fraud events. The GPS tracking was our costs for setting up a GPS tracking in the case for law enforcement.

Consistent with the letter, the PSR recommended the court award Sprint restitution in the amount of $48,715.59 for losses sustained between May 15 and May 25, 2011, with each co-conspirator to be held jointly and severally liable for that amount. The PSR explained that Sprint would not pursue restitution for losses sustained between May 8 and May 14, 2011, because sales receipts were unavailable for those losses. The PSR itemized the proposed restitution award as follows:

| | |
|---|---|
| Merchandise Losses (05/15/11-05/25/11) | $45,035.59 |
| Shipping Costs | $300.00 |
| Investigative Travel to NM | $750.00 |
| Investigative Hours [$65/hr x 40 hrs] | $2,600.00 |
| GPS Tracking | $30.00 |
| **Total Loss: $48,715.59** | |

In both his written and oral objections to the PSR, Defendant challenged Sprint's claim of loss for lack of proof. Defendant pointed out the Government did not present any evidence that his crimes caused Sprint to lose retail sales and attendant profits. Because cell phones are fungible goods readily replaceable through Sprint's voluminous supply chain (a point the Government has never disputed), Defendant argued that *in the absence of evidence of the phones' wholesale or replacement costs*, the actual prices he "paid" for the cell phones—discounted prices ranging from $149.99 to $199.99 as also shown on the sales receipts—were the better estimate of actual loss. Defendant reasoned:

> The loss of the phones is not the retail price of the phones. The loss to Sprint is the true wholesale replacement costs of the phones. No retail contracts or sales were lost due to the actions of Mr. Ferdman or the others. Sprint sells millions of phones per quarter and is in the business

9

of replacing them continually. Thus the loss of 100 or even 1000 phones would be insignificant to Sprint's supply chain. They would simply be replaced in the ordinary course of business.

Defendant stressed that Sprint had not provided the probation office with the cell phones' actual replacement or wholesale costs, so the "best approximation of the loss" was the actual purchase price of the phones. In the alternative, Defendant twice moved for an evidentiary hearing pursuant to 18 U.S.C. § 3664(d)(4).

In response, the Government did not address with any specificity the evidence (or lack thereof) of Sprint's actual loss, but rather told the district court "the PSR is on solid ground in assessing the full retail value of the phones for purposes of restitution." According to the Government, "when merchandise is stolen from a retail establishment the full retail price of the merchandise gives us an appropriate measure of the loss." The Government acknowledged that "the Tenth Circuit has not squarely addressed the question whether a restitution award may include lost profits in a retail theft case." Notwithstanding, the Government suggested to the district court that the "use of lost profits would seem particularly appropriate in this case because Defendant's conduct was not limited to stealing phones, but then reselling them to his co-defendants thereby fostering a black market for mobile phones. That market *presumably* has a small but perceptible effect on Sprint's sales and profits." (emphasis added).

The district court denied Defendant an evidentiary hearing, overruled his objections to the PSR's proposed restitution award, and ordered him, as part of his

sentence, to pay Sprint $48,715.59. In a lengthy opinion entered subsequent to sentencing, the court recognized, unremarkably, that "awarding Sprint the cellular telephones' retail value would include the profits Sprint would have made had it sold those phones." United States v. Ferdman, 2013 WL 6504300, at *17 (D.N.M. 2013) (unpublished). Though Defendant had not raised the issue, the court first addressed whether the meaning of the phrase "value of the property" as used in the MVRA, 18 U.S.C. § 3663A(b)(1), was broad enough to encompass such profits. The court concluded "the Tenth Circuit would permit including lost profits in valuing the property under the MVRA." Ferdman, 2013 WL 6504300, at *22.

The district court next addressed "whether the retail value of the cellular phones fraudulently obtained is the proper measure for restitution." Id. at *17. In holding that the phones' full retail value was the proper measure of Sprint's actual loss, the court found that Sprint's letter, "without anything to undermine it," satisfied the Government's burden of proof, making an evidentiary hearing unnecessary. Id. at *29 n.16.

> [H]ad Ferdman not fraudulently obtained the telephones, Sprint would have had them available to sell to other customers. Sprint sells the telephones to end users at retail value, and if not at this full value, at a subsidized price, relying on the accompanying service contract and fees. Ferdman prevented Sprint from receiving any of these sales, which would have provided Sprint with the telephones' cost as well as overhead operating expenses and profits. The United States has produced enough evidence to establish by a preponderance of the evidence that Sprint's actual losses include the full retail value of the telephones. See Sprint Letter at 1 ("The phones losses are the retail unsubsidized price of these phones."). The letter, as well as receipts

11

from the various transactions, provided evidence that the telephones' retail prices ranged from $499.99 to $549.99. See Sprint Letter at 1–2; Receipts at 2–3, 21.

Id. at *29.

Lastly, the court asked whether the Government had "produced enough evidence regarding Sprint's shipping and investigative costs to satisfy its burden of proof and to include those amounts in the restitution award." Id. at *17. The court again held Sprint's unverified letter satisfied the Government's burden:

> Ferdman has provided no evidence for his assertion that awarding Sprint restitution in the amount of the telephones' retail value, in addition to investigative costs, shipping costs, and costs to set up GPS tracking for law enforcement, is "double-dipping" because the latter costs are built into the retail price. . . . Sprint asserts that Ferdman's conduct in this conspiracy caused these losses. See Sprint Letter at 1. In the absence of contradictory evidence, Sprint's signed representation of its losses satisfies the preponderance of the evidence standard to justify awarding Sprint restitution of $48,715.589, which includes the merchandise's value, $750.00 in investigative travel costs to New Mexico, $2,600.00 in investigative hours, $300.00 in shipping costs of replacement merchandise to the stores, and $30.00 in costs for setting up GPS tracking for law enforcement. See Sprint Letter at 1.

Id. at *30.

## III.

Before commencing our analysis of the district court's restitution award, we need point out what this case is *not* about. This case is not about whether a district court may ever properly include lost retail sales or profits in a restitution award for property damage, destruction, or loss under the MVRA, and in particular § 3663A(b)(1). See United States v. Wilfong, 551 F.3d 1182, 1185–86 (10th Cir.

12

2008) (discussing a "seeming" circuit split regarding the scope of subsection (b)(1)).

Defendant has never raised or addressed this purely legal issue. Rather Defendant's argument regarding the insufficiency of the evidence implicitly acknowledges that a court may include lost sales and profits in a restitution award *if* part of the "actual, provable loss suffered by the victim and caused by the offens[ive] conduct." Fair, 699 F.3d at 512.

Accordingly, we simply *assume* the MVRA, and in particular § 3663A(b)(1), permits such an award, and proceed to a discussion of the issue Defendant presents for review: "Whether the district court imposed an illegal sentence by ordering restitution in an amount that exceeded the actual loss proved by the Government." We first consider the court's reliance on Sprint's letter and sales' receipts to justify awarding Sprint the "retail unsubsidized price" of the stolen cell phones. We then consider the court's reliance on that same letter to award Sprint the "estimated" expenses it incurred as a result of Defendant's crimes.

A.

Defendant asserts that in awarding Sprint criminal restitution, the district court abused its discretion by basing the "value" of Sprint's cell phones on their "retail unsubsidized price," absent any evidence that Defendant's fraud diverted sales from Sprint, thereby affecting its profits. The district court found as follows:

> *[H]ad Ferdman not fraudulently obtained the telephones, Sprint would have had them available to sell to other customers.* Sprint sells the telephones to end users at retail value, and if not at this full value, at a

13

subsidized price, relying on the accompanying service contract and fees. *Ferdman prevented Sprint from receiving any of these sales*, which would have provided Sprint with the telephones' cost as well as overhead operating expenses and profits.

Ferdman, 2013 WL 6504300, at *29 (emphasis added).

Given the district court's findings, one would think the record contains some evidence—beyond Sprint's unverified statement that "[t]he phone losses are the retail unsubsidized price of these phones"—tending to show Ferdman's theft caused Sprint to lose retail sales. Instead of pointing us to such evidence, however, the Government informs us in its response brief that it need not bother:

> The [MVRA] required the district court to order Ferdman to pay Sprint the value of the phones he stole . . . . The district court *estimated* this value to be the retail price of the phones, given that Ferdman stole the phones from retail stores. . . .
>
> * * *
>
> Because this case involved only theft, *the Government was not required to prove that Sprint lost any sales* because of Ferdman's fraudulent activity.

(emphasis added). But the Government's argument surely "collapses under the plain text of the MVRA, which places the burden on the Government . . . *to prove actual loss* by a preponderance of the evidence." Fair, 699 F.3d at 516 (emphasis added) (citing 18 U.S.C. § 3664(e)). In other words, in a case where a merchant claims its actual loss encompasses retail sales, the MVRA imposes on the Government the task of producing *some* evidence that the defendant's theft *in fact* caused the victim to lose retail sales.

14

Perhaps the closest we have come to addressing the necessity of proof under the MVRA where a merchant seeks the retail value of stolen goods is a case involving counterfeit goods. In United States v. Hudson, 483 F.3d 707 (10th Cir. 2007), the defendant counterfeited Microsoft software and attempted, unsuccessfully, to sell it to a Maryland company. The district court ordered defendant to pay $322,194.63 in restitution to Microsoft based on the PSR's representation, much like here, that the "estimated retail price for the counterfeit software was $599.99 per copy." Id. at 708. Again similar to our case, the PSR based its restitution calculation on Microsoft's "declaration of loss." Id. On appeal, defendant challenged the restitution award, arguing that "Microsoft suffered no actual losses from his conduct." Id. at 710. At the outset of our analysis in Hudson, we recognized that in the case of counterfeit goods, "[r]estitution must be based on net lost profits, not on total retail price." Id. at 710 n.1. After reviewing the record, we concluded the Government failed to present evidence of lost sales, and therefore failed to prove Microsoft suffered any actual loss of profit.

The Government tells us this case is not like Hudson because the MVRA does not require proof of lost sales in the case of simple retail theft. What the Government effectively says is that we should overlook the procedural dictates of the MVRA and dispense with the necessity of proof in cases like this one. See Paroline, 134 S. Ct. at 1733 (Roberts, C.J., dissenting) (observing that the Government did not "really contest" its inability to meet § 3664's burden of proof; rather the Government

15

"ask[ed] to be held to a less demanding standard"). Instead, the Government encourages us to formulate a rule that where retail goods are stolen, the proper measure of restitution necessarily is the undiscounted retail price of those goods. However convenient in application, we fail to see how the Government's approach leads to a restitution award "*rooted in a calculation of actual loss*," a calculation which Hudson plainly requires. Gallant, 537 F.3d at 1252 (emphasis added).

The Government's proposed approach seems to us rooted only in a theory of loss which the facts may or may not support. We well understand that whereas "[a] legitimate seller is harmed by a counterfeit good only when the product enters the market[,] a seller who is fraudulently deprived of [the] goods [themselves] is harmed as soon as those goods are stolen." United States v. Robertson, 493 F.3d 1322, 1333 (11th Cir. 2007) (affirming an award of the wholesale price of stolen goods). So unlike copyright infringement, the theft of retail goods causes the retailer to lose something of value at the outset, namely the cost of the stolen goods. See Wilfong, 551 F.3d at 1184 & n.2 ("[O]ne logical way to assess the value of lost property is by its cost to the victim—how much the victim paid for the lost property."). Surely Sprint lost *at least* that here. But why this initial loss, whatever the evidence shows it to be, should entitle Sprint to recover lost sales and profits as well absent proof of the same, escapes us. Indeed, such a rule would conflict with the requirements of proof set forth in both the MVRA and Hudson.

16

Undeterred, the Government cites two cases purportedly standing for the proposition that in calculating criminal restitution "[t]he best *estimate* of the value of the phones when Ferdman stole them was their retail price." (emphasis added). The problem is neither of those cases involved calculation of restitution under the MVRA, but rather calculation of loss for the purpose of establishing the defendant's offense level under the Sentencing Guidelines. In United States v. Lige, 635 F.3d 668 (5th Cir. 2011), the defendant fraudulently obtained cellular phones from Sprint and Nextel. Applying U.S.S.G. § 2B1.1, the Fifth Circuit held that "[b]ecause Sprint and Nextel offered these phones for sale in the retail market, . . . the retail price of the phones was the appropriate measure of *intended* loss." Id. at 669 (emphasis added). Obviously, intended loss and actual loss are not the same thing. "The calculation of loss under . . . the Sentencing Guidelines does not necessarily establish loss under the MVRA. Unlike loss under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics," such as intended loss. Gallant, 537 F.3d at 1247; see also Parker, 554 F.3d at 1323 (recognizing that loss calculations under the Guidelines require the court to make only a reasonable estimate of loss, "whereas a restitution order under the MVRA must be based on *actual* loss") (emphasis in original)).

Neither does our decision in United States v. Williams, 50 F.3d 863 (10th Cir. 1995), address the actual loss to a victim of retail theft. There, the defendant challenged the calculation of his guideline offense level for transporting stolen

17

jewelry. The statute under which the defendant was charged, 18 U.S.C. § 2314, requires the interstate transport of goods valued at $5,000 or more. To determine the loss for guideline purposes, we looked to the definition of "value" as used in § 2314: "Here, ''value' means the face, par, or market value, *whichever is the greatest. . . .*' 18 U.S.C. § 2311. Since neither face nor par value apply, the issue at hand is the 'market value' of the stolen jewelry." <u>Williams</u>, 50 F.3d 864 (emphasis added). Because the defendant stole the jewelry from a retailer rather than a wholesaler, we held consistent with the governing law that for the purpose of calculating defendant's offense level, the market value of the jewelry was its retail price.[2] In no sense does <u>Williams</u> stand for the proposition that the MVRA entitles a victim of retail theft to lost sales and profits absent proof of lost sales.

The PSR does state that Defendant sold some of the phones, many of which had been blocked from accessing the Sprint network, to a co-conspirator for resale.[3]

---

[2] In <u>Illinois Cent. R.R. Co. v. Crail</u>, 281 U.S. 57, 64–65 (1930), the Supreme Court reminded us that in the case of fungible goods, "[t]he test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to, if, for special reasons, it is not exact or otherwise not applicable."

[3] Paragraph 15 of the PSR explains:

Each cellular telephone, including each Sprint phone, has a unique ESN [Electronic Serial Number]. In order to prevent and deter fraud, when Sprint learns that a phone has been lost, stolen, or obtained by fraud, Sprint essentially "blacklists" the ESN corresponding to the phone, so that the phone can never again be activated on the Sprint network. . . . Despite their inability to be activated on the Sprint network, however,

(continued...)

18

Defendant also sold some phones to at least one other unidentified individual. But even the Government points out "the district court did not find that Ferdman's customers would have bought from Sprint had Ferdman not sold the stolen phones." Nor did the court find that those individuals who bought phones from Defendant's co-conspirator might have bought phones from Sprint instead. As the Government tells us, the court only "found that because Ferdman stole the phones before Sprint could sell them, Sprint could not sell *those* phones to another customer." See Ferdman, 2013 WL 6504300, at *29 (emphasis added).

So what the district court relied on in awarding Sprint the "retail unsubsidized price" of its phones was a sort of "kink-in-the-supply-chain" theory of lost sales, rather than a "lost-profits-on-diverted-sales" theory. See Anderson, 741 F.3d at 952. The former theory seems simple enough. All the Government would have to establish is that Defendant's theft of the cell phones caused a retail shortage at Sprint stores or interfered with the maintenance of its usual stock, and, as a consequence, caused Sprint to lose potential retail sales. See Illinois Cent. R.R. Co. v. Crail, 281 U.S. 57, 62 (1930). And we would think Sprint could provide the Government with evidence of a kink in its supply chain if in fact Defendant's theft caused such a kink. But the Government never presented any such evidence, and as the record now

---

[3](...continued)
there is still a market for "bad ESN" phones. Such phones can be "flashed" or have their factory settings erased, such that they can be activated on another network, including networks operating overseas.

19

stands, nothing therein even remotely suggests Defendant's theft, by removing readily replaceable cell phones from Sprint stores, prevented Sprint from realizing any retail sales. See id. at 65 (tying "retail price" to situations where the seller "suffered special damage by reason of the shortage," and "wholesale price" to situations where the seller "could replace [the goods] . . . in the ordinary course of business").

Let us make perfectly clear that the controlling metric for an award of restitution pursuant to the MVRA *in every case* is *actual* loss suffered; nothing more, nothing less. Therefore, we assume that where supported by the evidence, a district court in the case of retail theft might rely on lost sales and accompanying profits to calculate the amount of the victim's actual loss under the MVRA. Before the court relies on such measure of loss in the case of fungible or readily replaceable goods, however, the Government must present more than a claim that but for a defendant's theft, the victim may have made additional sales. See United States v. Boccagna, 450 F.3d 107, 119 (2d Cir. 2006) ("Criminal restitution . . . is not concerned with a victim's disappointed expectations but only with [its] actual loss."). The Government must present at least some evidence—we need not now decide how much—from which the court could reasonably infer lost sales. See United States v. Ahidley, 486 F.3d 1184, 1189 (10th Cir. 2007) (recognizing that in calculating restitution, "courts are permitted to draw inferences from the totality of the

20

circumstances through an exercise of 'logical and probabilistic reasoning'").[4]  And,

under a supply chain theory of loss, unless the Government can show the defendant's

crime depleted the stock of a particular fungible or readily replaceable good like a

cell phone, at a time when the victim might otherwise have been able to sell that

good to a willing buyer, something akin to replacement or wholesale cost clearly

---

[4]  In <u>Ahidley</u>, a stab wound resulted in serious injuries to the victim and necessitated airlifting her to a hospital for surgery.  The victim remained in the hospital for one week.  We explained that in assessing the reliability of loss figures provided by a third-party Medicaid provider, we were "permitted to draw inferences from the totality of the circumstances through an exercise of 'logical and probabilistic reasoning.'"  <u>Ahidley</u>, 486 F.3d at 1189.  We then reasoned:

> Nothing in the record would have given the district court a reason to question the loss amount claimed by [the provider].  Furthermore, its *probable accuracy* was supported by *inferences* that the district court could have reasonably made *from the evidence* regarding the severity of [the victim's] injuries and the medical interventions undertaken to treat her.  In other words, the amount claimed by [the provider] for [the victim's] medical care is consistent with the expenditures one might reasonably expect to be required to medically treat someone under similar circumstances.

<u>Id.</u> (emphasis added).  This is to say that in <u>Ahidley</u> nothing existed in the record to give the district court pause about the claimed loss because evidence existed regarding "the severity of [the victim's] injuries and the medical interventions undertaken to treat her."  <u>Id.</u>  In contrast, nothing in the record here supports Sprint's claim of loss as far as we can tell.  But plenty in the record—including Defendant's detailed objections—provided the district court good reason to ask whether the Government had met its burden of proof.  How logical and probabilistic reasoning from the record before us could lead to the conclusion that the district court's restitution award was an accurate measure of Sprint's actual loss escapes us.  Nor can we in good faith say the losses claimed by Sprint are consistent with losses one might "reasonably expect" in a case like this one.  <u>Id.</u>

appears the more accurate measure of actual loss.[5] See Crail, 280 U.S. at 63–65. Of course, because the MVRA's controlling metric is actual loss, the Government still must satisfy its burden to prove the amount of the victim's cost.

B.

This brings us to our second and final inquiry: Whether the evidence supports the award of the estimated expenses Sprint incurred in investigating Defendant's fraud. By this point, the answer to that question should be painfully apparent. All we have before us are *estimates* of Sprint's expenses supported by the unverified signature of a Sprint officer. The record contains no actual proof, not even an affidavit, of what those expenses were. That those expenses for the most part appear reasonable is not enough to satisfy the evidentiary dictates of the MVRA. The likelihood that certain facts exist to confirm Sprint's estimates, no matter how probable, does not relieve the Government of its burden, after proper objection, to establish their actuality. See United States v. Hosking, 567 F.3d 329, 334 (7th Cir. 2009) ("On remand, the government must, to the extent feasible, provide an explanation, *supported by evidence*, of how each employee's time was spent in

---

[5] The Government's ongoing insistence that the discounted price Defendant "paid" for the cell phones as shown on the sales' receipts is not a proper measure of restitution entirely misses the mark. Defendant has never claimed the discounted price is what Sprint actually lost as a result of his theft. He claimed only that in the absence of any evidence of what it actually cost Sprint to replace the stolen phones, that lesser amount, rather than the "retail unsubsidized price" of the phones, was an approximation of loss with which he could agree. Indeed, at oral argument, Defendant stated that Sprint's replacement costs was the proper measure of damages.

pursuing the investigation.") (emphasis in original)).

IV.

While the abuse-of-discretion standard under which we ultimately review a district court's award of restitution is deferential and highly so, such standard will not countenance a finding of lost sales based on a victim's unverified claim that "my losses are X and the value of X is shown on the sales' receipts." Unremarkably, where the amount of restitution proposed in a PSR is contested, the MVRA requires the Government to prove to a reasonable degree that the two values—"my losses" and "X"—are more or less commensurate. The MVRA binds courts to its statutory standards; in the criminal restitution context, that means a *fair* determination pursuant to 18 U.S.C. § 3664(e) of the actual losses caused by a defendant. Undoubtedly the MVRA's overriding purpose is to assure that district courts fully compensate crime victims for the actual losses they suffer. But that must not deter us from reading the MVRA as Congress wrote it, and, more particularly, from requiring some proof of the actual loss that a defendant caused the victim. See Hughey, 495 U.S. at 420–21.

Accordingly, the district court's order awarding Sprint restitution in the amount of $48,719.59 is vacated. The remainder of Defendant's sentence is unaffected. This matter is remanded to the district court for further proceedings consistent with this opinion.

VACATED and REMANDED.

23